IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.14 CR 497 |
| Plaintiff | ) | |
| | ) | Violations: Title 18, United States |
| v. | ) | Code, Sections 371, 1546(a), |
| | ) | 1425 & 1622 |
| | ) | |
| ROBERT DEKELAITA | ) | |
| | ) | Judge Matthew F. Kennelly |
| | ) | |
| Defendants | ) | |

DEFENDANT DEKELAITA'S SENTENCING MEMORANDUM

During the trial the Court observed an unusual number of people in courtroom who were by no means disinterested. They were Assyrian Christians, most of whom fled Iraq in the last twenty years. All experienced first-hand, or through a family member or former neighbor, persecution because of their faith and ethnicity. Because of their experience in Iraq they have strong opinions that the world has turned its back on the persecution of not only Assyrian Christians in Iraq, but all Christians in the Middle-East. The Assyrian community in America is very tight knit and insular. Although Americans readily recognize Syrians, most probably do not even realize there is a completely different culture and ethnicity, Assyrians. Although Assyrians have inhabited the same lands for thousands of years, they have no homeland. Like the Israelis they are not Arabs and yet live in Arab countries, mostly northern Iraq. They exist at the whim of totalitarian

1

governments or governments that are unable or unwilling to reign in extremists. They speak a different language and are Christian, not Muslim. They are, for the most part, and certainly in their own eyes, a people who have learned to survive in a difficult world. Even after immigrating to the United States, they bring with them a definite sense of paranoia regarding government.

Robert DeKelaita is of course an Assyrian Christian. He came to America when he was 10 years old with his mother and father. His father worked hard to provide for his family in the United States, which for them was truly the "land of opportunity." Robert went to college and then law school. He understood, like the many immigrant groups before him who suffered under alien governments, that by being a lawyer he could best fight the injustices he saw as a child. In doing so, he did not forget his Assyrian heritage and his Christian faith. And like all young lawyers before him, he worked to make a name for himself, both in the Assyrian community and the legal community. He lent his time and expertise to his church and to various Assyrian community organizations, helping arriving Assyrians and other refugees from the Middle-East find their way in this new land. One of their more obvious needs was the need to navigate American immigration laws. And with hard work he became a leader in the Assyrian community and developed a thriving immigration practice. With that success he became a recognized figure in the Assyrian community. People saw his hard work and his willingness to help others and they looked up to him. They brought that strong belief in Robert

2

DeKelaita and their loyalty to him as a leader of their small community into the courtroom. It is that sense of community and cohesiveness which has rallied them to DeKelaita's side. He has been there for them not only as a lawyer, but as someone who was willing to speak out regarding the persecution of Christians in modern day Iraq. He petitioned and met with American and Iraqi officials to address the persecution of Assyrians and Christians in Iraq.

There have been three indictments, various pretrial motions, two Santiago Proffers, two Bill of Particulars, testimony from numerous witnesses, arguments to the jury and post-trial motions, so the Court is well informed regarding the facts of this case which were intensely contested. Nonetheless, many of those previously discussed facts must be mentioned, as they may impact sentencing.

In its opening statement to the jury the prosecutor told the jury that asylum is "reserved for people who really need it." Tr. 28. She gave an example of such a deserving person, "a Christian minority and their house is burned down by Muslim extremists." Tr. 28. She accused DeKelaita of being a lawyer who knew what to say, when to say it and who to say it to, concluding that he "deceived the system" and "this was done for money." Tr. 28 – 29. On January 8, 2015 the government filed a motion for disclosure of defendant's income tax returns, arguing that they would show defendant's motivation. The Santiago Proffer intimated the same. R. 183, p. 3. While the practice of law is for DeKelaita, like it is for all lawyers, a business, it is also a profession. Thus, he like all lawyers must make a living to

3

support himself and his family. As to these clients he charged a fee for his work. There is, of course, nothing immoral in doing so. And there is certainly no evidence that his fees were exorbitant. Indeed, most of the fees, according to the witnesses, ranged between $1,500.00 (Raman Esho) and $4,000 (Albqal). Whatever else may be said about defendant, it would be unfair to conclude he was motivated by greed. He was motivated to help people who were escaping horrible situations or who wanted be reunited with their families in the United States.

Defendant would like to address Salman Salman's testimony that Deklaita gave him the option of an asylum application for $3,000.00 or an asylum application for $5,000.00, the latter carrying a guarantee. Tr. 1124. Salman's testimony offered nothing in the way of how this would be accomplished or what the $5,000.00 model would say that the $3,000.00 model would not say. Nor has the government ever offered any such explanation. The government's premise is that DeKelaita was totally corrupt and willing to submit to immigration officials asylum stories fabricated from whole cloth. "The false asylum stories included fabricated tales of rape, murder, torture, kidnappings, bombings, and other forms of religious persecution that DeKelaita … created from whole cloth." Santiago Proffer, R. 183, p. 17. According to the indictment, these "false asylum stories" included "false information," "false names, false dates of travel, false dates of entry to the United States, false information about foreign citizenship and false family history," "fictitious accounts of rape and murder" and "falsely created affidavits, baptismal

4

certificates, identity documents and other documents." R. 136, p. 5, ¶¶ 5, 6 and 7.
And this, according to the government is what Deklaita did routinely. (The
government told the probation officer that DeKelaita filed between 2,000 to 3,000
asylum applications, the majority of which were fraudulent. PSR, p. 8, ¶ 22.) It
boggles the mind that for Salmam Salmam there was a two tiered fee schedule, one
of which was guaranteed and the other not. How much less false would the
$3,000.00 model be? And how would the guarantee be accomplished? The identity
of the Asylum Hearing Officer who will make the decision is not even known until
the applicant is assigned to a hearing room. The unpredictability of these hearings
is illustrated by the fact that two individuals with virtually the same facts, yet one
was granted asylum and the other was not. GV, p. 7. DeKelaita denies that he ever
guaranteed a result or that he ever suggested a guarantee in seeking a larger fee.

Robert DeKelaita is, or rather was, a lawyer who focused on immigration law.
The government indicted him on September 4, 2014. It charged him with filing 12
false asylum applications beginning in 2000 and culminating 2011. In March 2015,
it expanded its charges in a superseding indictment, by charging two additional
false asylum applications, again between 2000 and 2011. In August of 2015, it
returned a Second Superseding Indictment, on the eve of an October 2015 trial date,
again expanding its charges. This time the government added another allegedly
false asylum application, a second conspiracy and Yousif Yousif as an indicted
coconspirator as opposed to an unindicted coconspirator. The second conspiracy

5

alleged that DeKelaita had engaged in a marriage fraud scheme. All three indictments also charged him with violations of Title 18 USC 1546(a) ¶ 1, Title 18 USC §1546(a) ¶ 2 and Title 18 USC §1622. Each of these Counts stated that DeKelaita had "procured" (Count 5), "subscribed as true" (Count 6) and "suborned" five specific false statements which, given the post-trial motion, are well known to the Court.

At trial, the government chose not to present evidence as to six asylum applications which were part of the asylum application conspiracy and moved to strike those allegations relating to those six asylum applications from the indictment, Lamie Jerjis (¶¶hh, ii and jj of Count 1), Malek Shamaya. (¶¶kk, ll, mm, and nn of Count 1), Laith Mikha (¶¶oo, pp and qq of Count 1), Firas Elia (¶¶ww, xx and yy of Count 1), Mari Jajoh (¶¶zz, aaa and bbb of Count 1). It also moved to dismiss Counts 2, 3 and 4. R. 242. In its GV the government seeks to revive those allegations without offering any evidence beyond their grand jury testimony and, by doing so, take advantage of the lesser burden of proof required at sentencing. The GV also asks the Court to consider the statements of 4 additional former DeKelaita clients, Yonan Diryaish, Asmaa Lasso, Nidhal Soulaqa and Hanna Hermiz. The allegations as to these four former clients are supported by grand jury statements or agents' reports. GV, pp. 6 - 9. PSR, p 7, ¶18. Defendant objects. Cross examination exists for a reason. It is through cross examination that we are able to ensure that a witness' credibility. This case provides a very good

6

example. Prior to the cross-examination of the witness Najam, the government and the grand jury believed that his testimony about his partner being killed was false, such that the grand jury charged DeKelaita with putting a false statement on Najam's asylum application (Counts 5 and 6) and suborning perjury at his asylum hearing (Count 7). However, after Najam was cross-examined, the government not only withdrew the allegation, it told the jury the statement was true. While the guidelines and case law is that a court may consider such evidence at sentencing, this tactic should not be condoned in this case. In this case, the government presented evidence of two conspiracies and five supposedly false statements. The jury found defendant not guilty of one conspiracy and o three of the four remaining supposedly false statements. This government chose not to present this evidence to the jury should not and the carefully prepared grand jury statements and agent reports of those individuals should have no bearing at sentencing.

The PSR, citing Agent Chesla, states that DeKelaita filed between "2000 and 3000 [asylum] applications," "the majority" of which "contained fraudulent statements and/or documents." PSR, p. 8, ¶ 22. Two comments are apropos. First, the statement is clearly supposition in that Chesla also told the probation officer that "DHS will hire two new officers whose job will be to review the aforementioned asylum applications." PSR, p. 8, ¶ 22. This statement implies that Agent Chesla's assessment is rooted more in opinion than in fact and that any definitive conclusion must await further review. Defendant would also remind the Court that the

7

government's investigation of DeKelaita began in June 2008 and here it is more than 8 years later. Second, the United States House of Representatives Subcommittee on Immigration and Border Security stated in a letter dated February 11, 2014 that 70% of all asylum applications contain indicia of fraud and 70% of asylum applications granted are "based on fraudulent applications." See House of Representatives Letter attached. Perhaps this is where Agent Chesla gets his information. It would be patently unfair to conclude on the basis of Chesla's unsupported remark that other asylum applications filed by Deklaita "contained fraudulent statements and/or documents" merely because Agent Chesla says they do. Neither the government nor the PSR apparently made any effort to support the comment that Agent Chesla passes off as fact. *What is interesting regarding Agent Chesla's scholarship as to the number of asylum applications filed by DeKelaita, is that the government could find only one allegedly false asylum application that was within the statute of limitations to present to the jury.*

The PSR also notes that the allegations in Count 5, 6 and 7 specified five separate supposedly false statements. PSR, pp. 5 and 6, ¶¶6, 7 and 8. It then states in paragraph 10 that defendant was found guilty of Counts 5, 6 and 7. While this statement is accurate, it fails to recognize the fact the government reversed itself as to one of the supposed falsehoods, that "Client H. A.'s brother's partner was killed," and told the jury that that statement was actually true. Tr. 1816. The PSR

8

also fails to mention that the jury found defendant not guilty of three (3) of the other four (4) supposedly false statements.

The PSR states that defendant "chose to proceed to trial and put the government to its burden of proof at trial by denying the essential factual elements of guilt." It concludes that therefore he should not be given acceptance of responsibility. Although there is an abundance of case law regarding what the guidelines call "acceptance of responsibility," a defendant should not be penalized for going to trial, when in that trial he was acquitted of a majority of the charges.

The GV and the PSR seeks a 6 level enhancement pursuant to USSG 2L2.1(b)(B), alleging that were at "at least 41 false documents, citing pages 12 – 14 of GV. Included among these 41 documents are 15 by individuals who did not testify at trial and are referenced above. Also included in the 41 documents are applications for permanent residency and citizenship with which DeKelaita had no involvement. Eliminating the documents for which the government presented no evidence and the seventeen (17) permanent resident and citizenship applications that DeKelaita had nothing to do with, there are 8 false documents. Therefore, the enhancement should be 3, not 6. USSG 2L2.1(b)(A). Accordingly, the offense level should be 20, not 23, and the guideline sentencing range should be 33 to 41 months.

Of course, the first and last issue in any sentencing is what should the sentence be? What is an appropriate sentence, "sufficient, but not greater than necessary to serve the purposes of sentencing?" Gall v. United States, 552 U. S. 38.

47 (2007). The United States Supreme Court has instructed district courts to use their ample discretion to fashion a sentence to "fit the offender not merely the crime." Pepper v. United States, 562 U. S. 476, 488 (2011).

A sentence of probation in this case, for this defendant can accomplish the goals of both punishment and deterrence both specific and general. As the Supreme Court has explained:

> [C]ustodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled '" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). [fn omitted]. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 581.3. Most probationers are also subject to individual "special conditions" imposed by the court.

> *Gall*, 552 U.S. at 47-48.

> "Probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives."

> *Gall,* 552 U.S. at 48, fn 4, (quoting 1 N. Cohen, *The Law of Probation and Parole §* 7:9 (2d ed. 1999)).

> Probation is viewed by many as rehabilitative in nature ... However, probation is also a punitive measure, and "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."

> *United States v. Brady*, 2004 WL 86414, at *8-9 (E.D.N.Y Jan. 20, 2004) (quoting

10

U.S. Sentencing Guidelines Manual ch. 5, pt. B Intro. Cmt.

Defendant has lost his license to practice law. He has lost his livelihood and been forced to move his family out of their home.

The government seeks the forfeiture of to 9 former clients who did not testify. As a starting point those sums should not be include$71,250.00. GV p. 16 and R. 265. Included in that sum are fees totaling $33,000.00 paid d.

The government also seeks to tarnish DeKelaita by arguing that he paid bribes to Michael Harper. He did not and he made no such admission to Alen Takhsh. After Harper had left the government and was looking for work as a private immigration lawyer, DeKelaita referred two cases to him for which Harper was paid.

Who is Robert DeKelaita? Robert DeKelaita immigrated to the United States from Iraq when he was child. His family fled persecution from the Baath regime in Iraq, where both his parents suffered discrimination first hand. His uncle was killed by the Baath regime. DeKelaita's mother, Ida DeKelaita, recounts their plight before coming to the United States in her letter to the Court. Like many immigrant families, the DeKelaitas came to the United States with very little and worked very hard to accumulate themselves and their children to the United States. Most important was education for their four children. Robert DeKelaita was a good student and had a specific interest in Assyrian history and cultural heritage. When he was 23, his father passed away suddenly. In an instant, this young man

11

had the burden of supporting his mother, his brothers and sister. He was now married and also had a child. To do this, DeKelaita worked two, and sometimes three, jobs while attending school. He received a Masters degree in Middle Eastern Studies from the University of Chicago and a law degree from Loyola University School of Law. He passed the bar, and began his professional career.

Linda Janicki wrote in her letter to the Court:

> Robert and his family came to this country with very little in their pockets and even less resources to start a new life with. I immigrated to the United States in 1980 and lived with my sister and her family. I have watched Robert grow up into the amazing person that he is today. This man grew up in not a wealthy environment and did not have the same financial freedom that most Americans enjoyed at that time. He, however, excelled in his studies. This kid's face never left the books.
> ......
> I remember when Robert started law school. He was a young husband and brand new father at the time. As you can imagine, this was no easy task for him. He graduated from law school while balancing work and family. He was working 2-3 jobs while attending Loyola University and raising a family.

As his friend of 30 years, John Khamo, wrote:

> His personal life took a sad turn when his father had an untimely death, and as a result Robert was forced to work extra hard to support his family while attending graduate school at University of Chicago. The void left by his father's passing made Robert involuntarily assume the role of a husband, brother, and student, all at the same time. The responsibilities were far greater for a man of his age, but at the end he succeeded to fulfill all of those roles through hard work and resilience.

His sister, Grace DeKelaita, wrote:

> Robert did everything he could to help me. He was my big brother but he was also my backbone. Whatever I needed, whenever I was in trouble Robert was there for me. He never let me falter and he never gave up on me. I know

12

that I can always depend on Robert to help me and counsel me in times of need and in times of confusion and despair. He is a good man but more importantly he is a good brother, son, husband, father and leader within our community. He is deeply religious and has traditional beliefs in all that he does.

His cousin, Nina Shamoon, wrote of the way DeKelaita inspired members of his family to pursue higher education:

As far back as I can remember, he has carried his family history with pride and continues to find ways to extend the families' achievements. He was one of the first of our family to attend college within the United States. I recall him talking to us younger cousins about working hard and achieving great things. When the time came for me to attend college, he, without hesitation, sat with me to help me look over my entrance applications and helped me make corrections as necessary.

DeKelaita's cousin, Ninos DeKelaita, wrote:

Ever since I can remember my cousin [DeKelaita] has been like an anchor to our family and myself. He has offered to help me with his time, money and efforts, but not just to me, all of our family has been helped by [DeKelaita] to stand up and be good citizens in the United States.

DeKelaita's youngest brother, Gilbert DeKelaita, described the positive influence his brother had on his life:

Robert has been a role model in my life from the earliest I can remember. He is educated, driven, and has been a force for good in our family and community. Robert was the first to get me to rethink my bad habits like smoking or wasting time as a young teen, showing me the importance of a healthy lifestyle, education, and hard work. He has worked hard to not only care for his own needs but the needs of others also.

......

Robert also impressed upon me a good work ethic, showing me the importance of hard work. He has worked hard since I can remember as a

13

child at school, college, and his career. All throughout his career he earned top grades.

Magda Janicki, wrote how working for Robert led her to become a lawyer:

I have always looked up to and respected Robert. In fact, I became an attorney because of my experiences with my interactions with him and my time that I worked in his office.

DeKelaita is known to others as a family man. His cousin, Ashor DeKelaita, wrote of him:

Robert is a dedicated husband of a loving wife and the father to two sons that adore him. The mere thought of him separated from his beloved wife of 25+ years, saddens me greatly… These young men are at pivotal points in their lives and they need their father now more than ever.

DeKelaita is also a man respected by others in the legal profession. He has earned a reputation for his commitment to his clients, and his personable and approachable demeanor to his fellow lawyers.

Tony Kalogerakos, a Chicago-based attorney, wrote:

Robert is a good friend, and a terrific role model for us younger attorneys. He is a well-respected member of our community, both the Assyrian, and legal community.

Another attorney, Paul Youkhana, described a time when DeKelaita agreed to meet him for lunch concerning his interest in attending law school:

During our almost two-hour lunch, Robert talked to me about the rigors of law school and of being a lawyer while answering every question I had regardless of how complex or simple. In addition to all the knowledge and advice Robert shared with me, he ended the lunch by offering me a job at his firm during the months leading up to the start of law school.

14

On his professional demeanor, DeKelaita's friend and fellow attorney, Phillip Zisook, wrote:

> Robert is soft spoken, articulate, and always professional. Robert has impressed me with his reasoned approach to legal issues, his concern for his clients' welfare and his willingness to argue for what is right.

Attorney Dragos B. Boscoianu recounted his first encounter with DeKelaita, when they were representing opposing litigants in a personal injury case:

> In observing Mr. DeKelaita during litigation, I found him courteous, straightforward, and completely devoid of any undesirable tactics. He was honest with his opponents, respectful of the judge, timely with all of his filings, and very easy to work with. He never abused the litigation process, never engaged in undesirable tactics in or out of court, and, as I was surprised to find out, he had done the whole matter pro bono.

From a young age, DeKelaita expressed an interest in Assyrian culture and history, working to preserve the Assyrian language and cultural legacy, which has existed for over 10,000 years. He helped found the Ashurbanipal Library in Chicago, as well as an Assyrian language center at his church.

As DeKelaita's cousin, Dr. Ninous Philip, wrote:

> [DeKelaita] was one of the founders of a number of Assyrian cultural centers in Chicago and wrote many articles about Assyrian history and heritage. His dedication to the Assyrian culture and people was the result of his desire to help a people on the brink of extinction, a people who had endured persecution and genocide in their homeland, and who were disappearing in the West. He has performed his tasks and duties in this regard with the utmost honesty and sincerity.

Another cousin, Dina Philp, wrote:

> I experienced how my cousin [DeKelaita] helped many associations and churches here in United States. He was one of the founders of Assyrian cultural centers and enriched Assyrian Library here in Chicago with many articles and documents. One day, my neighbor told me that [DeKelaita]

15

supported the Sunday school building financially in the church that she was attending, without knowing he is my cousin.

As the President of the Assyrian National Council of Illinois, Sheba Mando, explained:

> I knew [DeKelaita] as one who was involved in cultural and educational efforts in the community, an intellectual who sought to inspire the young in the community toward education and intellect. I met with him on many occasions because I was a printer and printed many books and magazines that he had brought to the print shop. While in law school, he published a magazine that was cultural and scholarly, Nabu Quarterly, that I printed and that was distributed in a number of states. Even prior to him becoming an attorney, he had struck me as an honorable person with deep intellectual abilities. In this way, he was able to earn the respect of those that came to know him.

One of DeKelaita's oldest friends, Peter BetBassoo, summarized DeKelaita's community work as follows:

> Robert and I worked on many projects for the Assyrian community. We published the magazine for the Assyrian Student Association. We attempted to start an Assyrian primary school, we founded the Ashurbanipal Library. We worked together for our people.

Many of DeKelaita's friends, family and employees can attest to his willingness to help people in need. DeKelaita's interest in helping the less fortunate developed at an early age, as his mother wrote:

> I recall one incident, when Robert was a child, in which Robert was sitting by my side, hearing the story of a man who was in need. Robert took money from my purse and placed it in the man's pocket. I asked him why he did that. He said that I had enough and the man did not have money to eat.

As the President of the Assyrian National Council of Illinois, Sheba Mando, wrote:

16

[DeKelaita] has, in addition to providing exceptional legal services, been a volunteer for many projects and has been a donor for numerous humanitarian issues. On numerous occasions, I have sent people to him to help and informed him that they had no funds. Without exception, and on every occasion, he has never failed to help for no fee. I have not found this kindness and spirit in any other attorney I have dealt with, and I have dealt with many.

Dr. John C. Michael, DeKelaita's friend and colleague on many Assyrian rights panels wrote:

[DeKelaita] has also used his legal and scholarly expertise in community service. From pro bono work assisting (and in some cases housing) individual refugees to counseling Assyrian community organizations to working to better inform and educate our federal government in Washington, DC, no one that I know has devoted as much time, energy, resources, ability, and intelligence to matters of such grave importance to Assyrian Christian refugees.

Nenveh Isho, DeKelaita's Senior Paralegal for 13 years, wrote of one particular pro bono case:

As an attorney, he is assertive about the rights of his client. Each client was a priority, regardless of where they were from. He felt the pain of people who needed help. I recall many examples. In one such case, there was a homeless man that was a former prisoner of war who had severe Post Traumatic Stress Disorder. The man would show up with no appointment at least once a week for months and would ask for Robert. Robert never let him leave without cash in his pocket and a ride to wherever he needed to go. He was never afraid of him and never hesitated to drop him off, even though many people, even his own relatives, did not want to engage the homeless man. In addition to helping him with money, Robert helped this man file for disability based on his disorder... His case was approved and we never saw him again. This is only one example on the type of person Robert is. Indeed, I could write a book on his interactions with those less fortunate.

Ms. Yousif remembered a pro bono case DeKelaita handled:

17

On another occasion, he helped a man by the name of Hani, whose case had been closed for many years because he had not been present when he was ordered deported by the Immigration Judge. The man was poor. In fact, he was homeless. Mr. DeKelaita took on the case pro bono. He reopened the matter and obtained an approval for Hani, thus terminating his deportation order and thus giving him legal status. Hani was very grateful and then returned and offered to paint the new office at no cost as a way to pay back for free legal services. Though Mr. DeKelaita refused, Hani kept offering until he came and painted two of our offices.

One of DeKelaita's clients, Maryam Odisho, wrote of his pro bono work for her:

I came to the United States to get treatment for my son, Daniel, who was a beautiful boy and who had cancer. He was 9 years old. We came both for medical reasons and because we were afraid to remain in Iraq. He in particular was afraid, both for me and for his father because the Islamic fundamentalist movement called ISIS had taken over the area next to our village.

......

My son died soon after he had his first operation. He desired to be well so he can one day become a doctor. Unfortunately, we lost him.

......

I came to Robert DeKelaita's office and asked for help. Without even a second thought, he promised to help me and not only took my case for no cost but also counseled me on having hope and moving forward with my life as a way to honor the life of my son, Daniel. I had believed that attorneys often take advantage of those who are in need of their services, but not [DeKelaita]. His kindness and compassion was so strong that it gave me hope.


Another former client, Benyamin Hewiyou, wrote:

I had made arrangements for my wife and my son who is handicapped, and daughter to come to the United States.

......

I knew of Robert DeKelaita and spoke to him. I told him my family's situation and that I did not have funds to pay because our funds were limited and could not hire an attorney. He did not hesitate to offer his help and said, 'just say it and I will help you. You don't need to worry about the money.'

18

CONCLUSION

Sentencing is a difficult task for a judge. It's also a difficult task for a lawyer representing a client to presume to suggest an appropriate sentence to the Court. Robert DeKelaita is a good man. He worked hard for his clients and made a positive impact on the community in which he lived and worked. With the jury's verdict, Robert DeKelaita has been branded a criminal, a felon. On September 3, 2014, he was a prominent lawyer. Now, twenty-three months later, all that has changed. Whatever the Court's sentence, Robert DeKelaita will have to pick up the pieces and put his life back together, yet he still has many of the same obligations that he had when his father died, 30 years ago. Recognizing these facts, and the evidence in this case, a sentence of probation would meet the purpose of a sentence in a criminal case, as dictated by 18 U.S.C. §3553.

Respectfully Submitted,

__s/_____
Michael B. Nash
William P. Murphy
Christina Abraham

19

Michael B. Nash
53 West Jackson Suite 618
Chicago, Illinois  60604

William P. Murphy
53 W Jackson Suite 1615
Chicago, Illinois
Attorneys for Robert DeKelaita

Christina Abraham
161 N. Clark, Suite 4700
Chicago, Illinois

20