UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 497-1 |
| v. | ) | |
| | ) | Judge Matthew F. Kennelly |
| ROBERT DEKELAITA | ) | |

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

The UNITED STATES OF AMERICA, by and through its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits its position paper as to sentencing factors, and asks this Court to impose a sentence within the applicable Guidelines range of 46 to 57 months' imprisonment.

## I.    BACKGROUND

Defendant Robert DeKelaita is a successful attorney with a long history of engaging in fraud. He owns a law practice called R.W. DeKelaita & Associates LLC, which represents foreign nationals applying for asylum and other immigration benefits. *See* Presentence Investigation Report, dated July 18, 2016 ("PSR"), at ¶ 13. The focus of this case is defendant's representation of foreign national clients, many (but not all) from Iraq, for whom he submitted fraudulent asylum applications with claims of persecution that were not wholly true. *Id*. at ¶ 17.

On May 8, 2016, defendant was found guilty by a jury of four counts: conspiracy to commit asylum fraud (Count One), submitting a false statement to the government to obtain asylum (Count Five), knowingly subscribing as true a false statement in an asylum application (Count Six), and suborning perjury (Count Seven).[1]  PSR at ¶ 10.

---

[1] Defense counsel says that defendant was "acquitted of a majority of the charges." R. 276 at 9. That is

1

At his first opportunity for contrition, however, defendant still refuses to accept responsibility for his conduct. As discussed below, he continues to assert that the government's evidence was contrived and the testimony coerced. To the contrary, that evidence and testimony—found by a jury to prove his guilt beyond a reasonable doubt, summarized in the government's version of defendant's offense, submitted to the Probation Office on May 23, 2016 ("GV"), and supported by the attached reports of interview and other documents—shows that defendant's scheme included the making of false statements in asylum applications and at asylum interviews, but also was far more sophisticated than telling simple lies. Defendant's scheme included an elaborate arrangement by which he coordinated with foreign language interpreters to ensure that the elaborate lies he constructed and included in asylum applications were repeated, persuasively, at asylum interviews, and a related scheme in which he paid bribes to an immigration prosecutor to ensure that, for the more challenging cases referred to the Executive Office of Immigration Review ("EOIR"), the government responded favorably to his motions and arguments. Defendant's criminal conduct spanned more than a decade and, in short, consisted of defendant putting his desire for profit or personal benefit ahead of the integrity of the immigration system and, in some cases, the interests of his own clients.

More specifically, as further detailed in the government's version of the offense, defendant's crimes included the following:

### Defendant Drafted and Submitted False Stories of Persecution on Behalf of Clients

Over a period of time spanning almost a decade, defendant prepared, submitted, and presented as true asylum applications that contained material lies to the United States Citizenship

untrue. He was acquitted of a single count (Count Eight).

and Immigration Services ("USCIS"). The false asylum stories included fabricated tales of rape, murder, torture, kidnappings, bombings, and other forms of religious persecution that defendant created from whole cloth. *See* PSR at ¶ 18.

Examples of 18 clients who agreed with defendant to tell these lies are highlighted in the government's version at pages 4 through 9 and in the government's response to defendant's post-trial motions (R. 267) at pages 2 through 10.

### *Defendant Arranged for Arabic/Assyrian Interpreters to Falsely Translate For Clients in Asylum Interviews*

As summarized in the PSR, defendant's fraud scheme was more sophisticated than simply slipping lies into asylum applications. Unlike more routine fraudsters, defendant worked to make sure that his lies succeeded in getting his clients asylum. One of the ways that he did this was to ground his lies in Iraq's reality. For example, the Assyrian Democratic Movement ("ADM") is an ethnic Assyrian political party in Iraq that has been targeted by extremists. Defendant adopted this narrative for his clients, weaving membership in the ADM into their stories to enhance their credibility and believability.

Another important way that defendant ensured the success of his lies was to include Arabic/Assyrian interpreters in his conspiracy. Even for those clients who spoke fluent English, as some did, defendant supplied an interpreter for the asylum interview at USCIS. Then, when translating questions and answers, per the agreement with defendant, the interpreter did so with only minimal respect for the need for accuracy. PSR at ¶¶ 19-20. The interpreter's role was important, and it was strategic, allowing defendant to control for clients' failed or limited memories.

Both Adam Benjamin and Yousif Yousif have admitted that they conspired with

defendant to commit fraud on behalf of defendant's clients. R. 79, 272. Specifically, consistent with the testimony of the witnesses at defendant's trial (PSR at ¶¶ 19-20), Benjamin and Yousif admitted that they worked with defendant to prepare his clients to give false testimony at their asylum hearings, including by instructing clients to memorize certain fake information in their stories of persecution, and that they provided false translations at asylum interviews to make the clients' asylum claims appear stronger than they were. R. 79, 272.

### *Defendant Paid Bribes to an Immigration Prosecutor*

But defendant's fraud did not stop there. For those cases referred to immigration court (EOIR), defendant felt the need to grease the wheels. And so, after making friends with immigration prosecutor Micheal Harper, who was Assistant Chief Counsel for the Department of Homeland Security's Office of the Chief Counsel, defendant regularly paid him cash bribes. Harper has admitted that defendant paid him cash under the table, totaling no less than $5,000; that the cash often was passed covertly during a handshake; and that the cash sometimes was accompanied by a discussion of defendant's pending cases at EOIR. There was at least one occasion on which, discussing a case in which defendant and Harper were opposing counsel, defendant asked Harper what "it was going to take" for defendant to win the case. Harper understood that the cash payments were related to his official position at DHS and certain actions defendant wanted him and others to take in pending cases. *See* GV, Exh. J; PSR at ¶ 21.

Although the government does not intend at this time to call Harper to testify at the sentencing hearing, it is not correct, as defendant asserts, that the Court may not rely on non-testimonial evidence at the sentencing hearing. To the contrary, "a sentencing judge is free to consider a wide variety of information that would be inadmissible at trial, including hearsay."

*United States v. Campbell*, 985 F.2d 341, 348 (7th Cir. 1993) (internal marks omitted). Well-established case law holds that a sentencing court may rely on witnesses' out-of-court statements, even if they otherwise would be inadmissible hearsay at a trial, so long as they possess sufficient indicia of reliability. *See, e.g., United States v. Marshall*, 208 F. App'x 481, 483 (7th Cir. 2006); *United States v. Dilworth*, 168 F. App'x 89, 92 (7th Cir. 2006) ("this court previously has allowed written summaries of an agent's interviews with witnesses and the defendant to be used at sentencing" (internal marks omitted)).

Harper's admissions, reflected in the reports of his interviews, are reliable. He has no incentive to lie to the government about his own misconduct. The defense wants the Court to believe that, even though he was promised nothing and has received nothing, Harper would falsely admit that he committed the federal crime of accepting bribes related to his official position. That is nonsensical. In addition, corroborating Harper's admissions is associate attorney Alen Takhsh's recounting of a conversation he had with defendant about Harper. Takhsh was not permitted to testify about this conversation at trial, but he did testify about the conversation under oath in the grand jury, explaining that, on one occasion, after an uncharacteristically difficult hearing with Harper, DeKelaita expressed surprise that Harper would act so confrontational. During further discussion, DeKelaita explained that he slipped Harper a few hundred dollars cash to not object during his hearings. *See* Exh. K.

## II. THE ADVISORY GUIDELINES RANGE IS 46 TO 57 MONTHS' IMPRISONMENT.

The government agrees with the Probation Officer's Guidelines calculations. PSR at ¶¶ 32-43. As the PSR outlines, defendant's advisory Guidelines range is 46 to 57 months' imprisonment, calculated under the November 2015 Guidelines Manual.

Under Guideline § 3D1.2(b), all counts of conviction are grouped together into a single group because they involve the same victim (the U.S. government) and are part of a common scheme or plan. The applicable Guidelines provisions are Guideline § 2L2.1, which governs the trafficking in documents related to naturalization or legal status (18 U.S.C. § 1546), and Guideline § 2J1.3, which governs the suborning of perjury (18 U.S.C. § 1622). Both provisions result in the same adjusted offense level of 23.

- Under Guideline § 2L2.1(a), defendant's base offense level is 11. PSR at ¶ 33.

- Pursuant to Guideline § 2L2.1(b)(2)(B), defendant's offense level is increased by 6 levels because he prepared and submitted between 25 and 99 false and fraudulent documents on behalf of clients. PSR at ¶ 34.

  41 such documents are identified in the table at pages 13 and 14 of the government's version. These documents include the asylum applications defendant prepared for 18 former clients, plus the asylum application defendant filed on behalf of government cooperator Fadhil Rasho, as discussed at trial. It also includes green card applications filed by 11 of these clients, citizenship applications filed by 6 of these clients, and the citizenship application defendant filed for Salman Salman's son, Amir Hummi, which was the subject of trial testimony. Counting just these applications, the number of documents for which defendant is responsible is 36. The government also added the 5 cases discussed by Alen Takhsh in his testimony, in which Takhsh represented clients in asylum interviews where Benjamin falsely translated the clients' testimony.

  Defendant says that he should not be held responsible for documents that he did not himself prepare, such as green card and citizenship applications. This argument is meritless for all of the reasons previously outlined in the government's response to his post-trial motions. Under well-established law, and pursuant to Guideline § 1B1.3, defendant is responsible for acts he "willfully caused" or were "reasonably foreseeable" to him. U.S.S.G. § 2B1.3(a)(1)(A), (B). In this context, demonstrated by the letters he sent some clients that outlined their next steps for permanent legal status, it was reasonably foreseeable to defendant that his clients would use their fraudulently-obtained asylum status to receive green cards and citizenship.

  The 41 total documents is a very conservative estimate. It does not include the fake Iraqi ID and birth certificate defendant secured for Raman Esho. It does not include the applications defendant filed for Sabah Mosa's wife and children as riders. It does not include the fake baptismal certificates defendant instructed Saad Salman to get from Iraq. It does not include the fake affidavits that defendant submitted to USCIS in connection

with Rawa Jibrail's application. It does not include the fraudulent church membership letter defendant instructed Rafida Jabo-Cordova to secure. It also does not include the identity documents Rafida Jabo-Cordova submitted to defendant and that defendant arranged to have falsely translated in a different name. Including these documents would put the number well over 55.

- If Guideline § 2J1.3 were used instead, defendant's base offense level would be 14, increased by 3 levels under Guideline § 2J1.3(b)(2) because defendant's subornation of perjury substantially interfered with the administration of justice for the reasons identified at pages 11 and 12 of the government's version.

- Pursuant to Guideline § 3B1.1(a), defendant's offense level should be increased by 4 levels because he was the leader of criminal activity that involved 5 or more participants. PSR at ¶¶ 36-37. As discussed in more depth in the government's version, defendant was the center of the conspiracy. He is materially indistinguishable from the attorney-defendant in *United States v. Bandrich*, No. 14-3104, 2016 WL 321003, at *2 (2d Cir. Jan. 27, 2016), where the Second Circuit held that the leadership enhancement was appropriate because the defendant acted as the boss of an immigration law firm that filed fraudulent asylum applications, edited drafts, signed asylum applications, instructed employees to attend hearings, and instructed translators. Defendant did all of these things.

- Pursuant to Guideline § 3B1.3, defendant's offense level should be increased by 2 levels because he abused a position of trust. PSR at ¶ 38. As the PSR notes, as an attorney, defendant was an officer of the court and had an ethical duty to tell the truth. He manipulated and exploited this position.

- Defendant is not entitled to points for acceptance of responsibility because he has not, in fact, accepted responsibility for his offenses. Defendant complains that he should not be penalized for going to trial. That misses the point. Not only did he put the government to its burden of proof at trial, but since then, defendant has made a number of public statements that make clear he shows no remorse for his actions. For example, interviewed by Fox News after the trial, defendant claimed that the government's case was biased against Iraqi Christians ("It should make anyone pause as to why all of the [government witnesses] were Iraqi Christians") and that the testimony of government witness was coerced ("It should make any attorney very afraid that the government can go back to a client from 15 years ago and coerce them"). Other examples that show that defendant has doggedly refused to accept responsibility and continues to minimize his criminal conduct are discussed below.

Defendant's adjusted offense level, therefore, is 23. Coupled with criminal history category I, defendant's advisory Guidelines range is 46 to 57 months' imprisonment. PSR at ¶¶ 43, 83.

## III.    APPLICATION OF THE SECTION 3553(a) FACTORS

The facts of this case, together with the factors set forth in 18 U.S.C. § 3553(a)[2]—in particular, the value our society places on the integrity of our lawyers and legal system, defendant's abuse of the trust placed in him as an officer of the court, defendant's failure to accept responsibility (in fact, his flouting of that responsibility, repeatedly), and defendant's other past actions indicating a profound lack of respect for the law—demands a meaningful sentence of incarceration within the applicable Guidelines range.

### A.    The Nature and Circumstances of Defendant's Crimes Weigh Strongly in Favor of a Within-Guidelines Sentence of Incarceration.

#### 1.    Defendant's Crime Harmed and Undermined the Asylum System.

There scarcely could be a more serious crime, in terms of its impact on the integrity of the immigration system and public confidence in that system, than defendant's.

Protecting persons who are persecuted is a core American value reflected in the U.S. asylum system. The United States government offers asylum to people who are victims of atrocious crimes and circumstances, ranging from honor killings to human trafficking to domestic violence to brutal violence. But the system depends on truthfulness. It functions properly only when its participants act in good faith. By their nature, asylum spots are limited; not everyone can receive asylum. They are intended for individuals who are most brutalized, most persecuted, and whose lives would not be secure if not granted safety in the United States.

Defendant's well-orchestrated scheme undermined the integrity of a system that relies

---

[2] Criminal sentencing has four purposes: retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Title 18, United States Code, Section 3553(a) sets forth the factors to consider when determining a sentence that is sufficient, but not more than necessary, to comply with these purposes, which include but are not limited to the nature and circumstances of the offense, the history and characteristics of defendant, and the need for the sentence imposed considering the offense's seriousness, the need for deterrence, and protection of the public.

heavily on immigration attorneys to act, as they are required by their oath to do, as agents of the court. The asylum process, arguably more so than other parts of the legal system, is heavily dependent on individuals accurately reporting their personal histories and experiences, and because there are limited resources for transnational investigations,[3] immigration officials rely on attorneys to ferret out frivolous or untrue claims. This is why, unlike many applications or filings, the attorney is required to sign an asylum application under oath, certifying the following:

> I declare that I have prepared this application at the request of the person named in Part E, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under U.S.C. Section 1324(c).

Translators, like those with whom defendant conspired, also play an important role in this system. Translators are required to sign an oath at the beginning of the asylum interview, attesting to the truthfulness of the translations. This is because, in most interviews, the asylum officer does not speak the same language as the asylee. The asylum officer does not know the answers to questions being spoken by the applicant, only the answers as translated by the interpreter. Defendant knew that this created a significant opportunity for fraud.

Defendant took advantage of this system. He manipulated it, he exploited it. He learned its loopholes and gamed them, fitting his carefully-drafted lies into what he knew asylum officers to be looking for, matching those lies with media reports of real events in the asylees' home countries. As the Second Circuit has explained in a similar case, defendant "possessed the

---

[3] The asylum officer does not typically have at his or her disposal corroborating information about the asylee's claims, to be able to independently verify their truthfulness. In fact, in the most severe of persecution cases, where the asylee has been forced to flee his or her homeland without family or resources, the asylee may be unlikely to be able to produce corroborating information that would be personal or specific to their own circumstances, rather than generic to their religious or socio-political group as a whole.

discretion to determine how to handle each of his clients' cases, and he abused that discretion when he elected to submit or direct the submission of fraudulent applications on their behalf." *United States v. Walker*, 191 F.3d 326, 338 (2d Cir. 1999). And, by his crimes, defendant obtained asylum for individuals who did not deserve it—who took their spot from someone who may actually have suffered persecution but did not present their claim with the same amount of drama or pizzazz.

### 2. Defendant Has Demonstrated a Profound Disrespect for the Truth.

The actions of defendant and his co-conspirators reflect a complete disregard for the truth. This is most evident in his recorded conversations with Rafida Jabo-Cordova. On October 28, 2010, defendant instructed Jabo-Cordova not to tell anyone that he wrote her story because they would get in trouble: "If you say it's not my story, someone else wrote it for me, you are going to get in big trouble, okay. . . . Don't do that. . . . You have to read it, it's very simple." G. Exh. 4B2. During a telephone conversation on February 28, 2011, defendant instructed Jabo-Cordova not to tell the truth:

> [S]tick[ ] to the same story because . . . any time you change something and you come back and say, "Well, I'm sorry, you know, I lied, and you know, this and that." Even if God has told you, it doesn't matter. . . . If, if you confess . . . it never works in your favor.

G. Exh. 5A2. This is despicable conduct by an attorney whose highest duty should be to the truth.

### 3. Defendant's Crime More than Likely Was Not Limited to the 18 Cited Examples.

The government has cited 18 examples of former clients on whose behalf defendant prepared and submitted fraudulent asylum applications. Although the government has not attempted to interview all of defendant's former clients, the circumstantial evidence suggests that this is a highly conservative estimate. First, it includes only those former clients of defendant's who have been willing to admit working with defendant to fraudulently obtain asylum. These

clients have zero incentive to falsely admit to receiving asylum by fraud, but individuals who have received asylum have all of the incentives in the world to preserve their immigration status by denying conduct as difficult to prove as the allegations in this case.

Second, defendant told clients that he committed fraud in other cases. For example, after suggesting that they make up a story that claimed she came directly from Iraq, instead of from Sweden, defendant boasted to Rawa Jibrail that he had done the same thing before for other clients and that "it shouldn't be a problem." Tr. 432-33.

Third, defendant's operation was a well-oiled machine. He had an efficient process in place: He met with potential Chaldean clients near Detroit, where many lived; listened to a short bit of their life story; suggested a better story; and prepared their application. Many clients described defendant as working quickly, not really caring about the details of their real stories. *See, e.g.,* Tr. 1205-06, 1259, 1266-68. He prepared so many applications that, in many instances, he simply forged the name of the applicant, so that he did not have to take the time to send the document through the mail to his client. *See, e.g.,* Tr. 578. He had a series of stories and news articles from which he selected, often including reference to the ADM. *See, e.g.,* Tr. 448, 579, 789-90, 1139-40, 1210, 1383. He had a team of translators who have admitted to conspiring with defendant to present lies to immigration officials. R. 79, 272. He had a team of people he could contact for fake documents, like birth certificates. *See, e.g.,* Tr. 1372-73. The sophistication and efficiency of this practice suggests that, over the course of a decade, defendant prepared many more than 18 fraudulent asylum applications.

This is demonstrated, too, by defendant's extensive knowledge of how to commit fraud without being caught. Defense counsel focuses much attention on the fact that the investigation

in this case was long-running and the fraud difficult to prove. No doubt both things are true, which is a testament to defendant's cunning and expertise. For example, defendant knew that the government collects fingerprints when an individual attends their asylum interview and runs those prints through government databases to identify the applicant's immigration history. Tr. 73. Defendant used this information to carefully select the clients for whom he suggested asylum fraud, knowing that a prior entry into the United States on a valid passport from another country could be concealed only if fingerprints were not taken at the time of entry. Thus, prior to suggesting to former client Rawa Jibrail that she change her name and hide her Swedish citizenship, defendant made sure that she had not been fingerprinted when she entered the United States on a Swedish passport. Tr. 431. He did the same for Jabo-Cordova, regarding her transit through Miami on an Ecuadorian passport. Tr. 555. But, for a former client (Mona Yousif) who *was* fingerprinted when she entered the United States on a Swedish passport, defendant went another route and suggested marriage fraud instead of asylum fraud. Tr. 1557. This shows a calculated scheme formulated to avoid detection.

### 4. Defendant Self-Interested Actions Harmed His Clients.

Defendant seems to think of himself as a Robin Hood of refugees, who took it upon himself to secure legal status for those whom he thought deserved it. But this was not his prerogative. It is Congress's job to set forth the requirements to obtain asylum and it is the job of the executive branch to assess whether an applicant is asylum-worthy.

In any event, defendant's argument is based on a grossly inflated sense of self. First, it is simply untrue that his fraud was "motivated" by a desire to "help people who were escaping horrible situations." This misrepresents his clients' actual life situations. Many of defendant's

clients (indeed, the vast majority of the witnesses who testified at trial) had a safe place other than Iraq to live. They were not in danger in Iraq, whether because of their Christianity or otherwise. Many had left Iraq years before (for some, they had not lived in Iraq for upwards of 20 years at the time they met defendant), moved to and gained legal status in first world countries, had children who also were citizens of these new countries. They *chose* to move to the United States, many for personal reasons; they were not forced to come here by the absence of safe alternatives. *See, e.g.,* Tr. 424-28, 495-97, 773-77, 1120-23 (testimony by trial witnesses about their legal status in safe countries, such as Sweden, Canada, Ecuador, Germany, and Australia).

Second, defendant fails to acknowledge the serious and costly nature of his conduct, which includes not only its impact on the asylum system but also its detrimental impact on his own clients. This includes Sabah Mosa and Iklas Zaya, who explained, through tearful testimony, that defendant actually lied to them about winning their case, only for them to later learn that they were not granted asylum. *See, e.g.,* Tr. 1301-05, 1353-55. Defendant sent them a letter that read: "Congratulations on succeeding in your case!" G. Exh. 42. It was only after they applied for government benefits and were denied—after the time to appeal the denial of asylum had expired—that they learned their application had been denied. This conduct is inexplicable and deprived defendant's own clients of legal rights that otherwise would have been available to them.

Sure, many of defendant's clients received asylum, but it has come at a cost. Many of these asylees now face deportation because of their fraud with defendant. Others have been forced to live the lies that defendant crafted for them. For example, Rawa Jibrail credits defendant with having ruined her life. Her asylum statement states that her parents were dead, and in an effort to

avoid detection by the government, she has lied to friends, family, and work colleagues about her parents' whereabouts; it has affected her social life, her ability to date others within or outside of her community, and her emotional health. Supplemental Government's Version ("Supp GV"), Exh. S.

5. Defendant's Past Conduct, Including Using His Money To Attempt To Buy Power, Indicates A Profound Disrespect For The Law.

Defendant's willingness to corrupt and tell lies is evident not only in his submission of fraudulent asylum applications to USCIS but also in his interference with the relationship between prosecutor and public.

Defendant's bribery of Micheal Harper is serious and should be taken into account by this Court in formulating a fair and reasonable sentence. Nothing undermines public confidence more than bribery and this is especially so when the person defendant bribed was not just an attorney, but a sworn public official entrusted with the responsibility to represent the interests of the Department of Homeland Security. The under-the-counter cash dealings between Harper and defendant represents a serious threat to our democratic governance.

It also is worth noting that defendant's cash payments to Harper were not a one-time error of judgment. Defendant made those payments on a regular basis, over the course of years, as recently as in 2012. This is conduct properly characterized as systematic or pervasive corruption of a governmental function and should be accounted for in defendant's sentence. *Cf.* U.S.S.G. § 2C1.1, Application Note 7 ("Where the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause a loss of public confidence in government, an upward departure may be warranted.").

6. <u>Defendant's Conduct Has Required the Expenditure of Significant Government Resources.</u>

Defendant's fraud has demanded the expenditure of substantial governmental resources, both judicial and prosecutorial. The investigation of defendant spanned multiple years. It involved the interviews of hundreds of people. It necessitated a three-week trial. But the resources expended have not been limited to this prosecution; defendant's fraud also taxed the immigration and judicial system. There has been at least one opinion by a federal court of appeals grappling with the effects of DeKelaita instructing a client to lie. *See Lazar v. Gonzales*, 500 F.3d 469 (6th Cir. 2007). DeKelaita's clients' cases, at times, were referred to immigration court, necessitating hearings at which witnesses were called and lengthy arguments were heard. For example, Jabo-Cordova's asylum application was referred to immigration court, and she testified at the court hearing represented by DeKelaita. As she explained at the trial in this case, the immigration prosecutor discovered in her file her real birth certificate (in the name Rafida Jabo, instead of her fake name on the asylum application, Rafal Khizme). The prosecutor had researched the fax number that appeared at the top of the birth certificate, determined that it originated in Ecuador (where Jabo-Cordova had citizenship), and confronted Jabo-Cordova about it. The result was a lengthy hearing that required a short continuance for DeKelaita to produce a fictitious explanation for the Ecuadorian-linked birth certificate (he ultimately said that it was for another client of his, apparently also named Rafida Jabo), and then a judicial determination that Jabo-Cordova was not credible in her testimony and was not eligible for asylum. *See also United States v. Kocsak*, 1997 WL 610457, at *3 (N.D. Ill. Sept. 19, 1997) (perjury that necessitated two-day hearing, and a 15-page opinion, "substantially interfered with

the administration of justice"). All steps in this process taxed resources that could have been dedicated to real cases and real issues.

**B.      Defendant's History and Characteristics Warrant a Guidelines Sentence.**

Defendant benefited from every possible advantage as he grew up.   He had a "very close" relationship with his parents and siblings, and his upbringing and current family life appears to be devoid of any major issues. PSR at ¶¶ 57-59. He is well-educated, having earned bachelor's, master's, and law degrees from well-regarded institutions. PSR at ¶¶ 73-74. And he is wealthy, reporting assets exceeding half a million dollars and, at its height, a monthly income of $50,000. PSR at ¶ 78. Notwithstanding these many advantages, in his late 30s or early 40s, defendant began the instant scheme. While he has no other criminal convictions, the length and nature of the charged scheme, combined with his dogged determination to deny all culpability and his lack of contrition for the scheme, shows he has not been deterred by the wisdom that typically accompanies a person's age or experience.

On this last point, defendant has shown zero remorse for his actions. Courts routinely consider a defendant's lack of remorse and failure to accept responsibility for crime as a factor that is correlated with the likelihood of recidivism. *See, e.g., United States v. Angle*, 598 F.3d 352, 359 (7th Cir. 2010); *United States v. Stewart*, 686 F.3d 156, 168 (2d Cir. 2012); *see also United States v. Fechete*, 497 F. App'x 626, 630–31 (7th Cir. 2012) (district court properly considered defendant's minimization of responsibility for scheme in imposing sentence). Defendant has doggedly refused to accept responsibility and continues to minimize his criminal conduct. Throughout the trial, defendant characterized the government's case as a witch hunt and the witnesses' testimony as coerced—even though that picture is at odds with his own recorded

conversations directing a client to lie. Even after the jury verdict, defendant has not acknowledged his own personal culpability. In fact, he continues to make claims that are simply outrageous about the government's case. He recently sent a letter to current clients, withdrawing from their cases after the guilty verdict but claiming that the case is one big conspiracy against him:

> The evidence used against me was the testimony of the witnesses who were, I believe as do many, either forced or coerced into testifying against me. . . . I have cheated no one and have not told anyone to lie. I have protected my clients as any good attorney should. That was my role and that should be the role of any worthy attorney. I have had the support of thousands of people around the world and the support of all who know me well, both professionally and personally.

Supp. GV, Exh. T. Other examples of this type of conduct, including statements he made to Fox News, are cited above and in the government's version.

## C. A Guidelines Sentence is Necessary to Provide Deterrence.

Defendant has gone to great lengths to show the Court, by the letters he submitted and the audience he attracted at his trial, that he is well-respected within his community. And no doubt he is. But with that reputation comes responsibility, and defendant has flouted that responsibility. The respect he is given by his community makes it all the more important that this Court's sentence reflect the seriousness of his offense. Defendant has proven himself to be resilient and obstinate in his use of fraud to achieve his success, and as a result, it will be his sentence that will garner the media and community attention that promises deterrent effect.

The need to deter others who may commit future crimes of this sort is uniquely high in this case. *See* 18 U.S.C. § 3553(a)(2)(B). Defendant asks for a sentence of probation. The Guidelines do not authorize probation in this case, *see* PSR at ¶ 89; U.S.S.G. § 5B1.1, but even if they did, it would send a horrible message to those practicing in the immigration law community

that fraud is not a big deal. It *is* a big deal, and a meaningful sentence of incarceration for defendant would send a strong message of deterrence.

In this context, where the government must rely on the truthfulness of the information submitted by asylees and their representatives, the concept of deterrence is more than theoretical. Fraud and abuse is rampant in the immigration system; it continues to occur, seemingly unabated, at staggering levels. Anecdotal stories indicate that fraud is frequently the means by which immigrants obtain immigration status in the United States. *See, e.g., Asylum Fraud in Chinatown: An Industry of Lies,* New York Times (Feb. 22, 2014, available at http://www.nytimes.com/2014/02/23/nyregion/asylum-fraud-in-chinatown-industry-of-lies.html. More concretely, in 2014, the House Judiciary committee released a USCIS document entitled, "Asylum Benefit Fraud and Compliance Report" that discloses that approximately 70 percent of asylum cases from a random sampling were proven to be fraudulent or had strong indicators of fraud. *See* Asylum Fraud: Abusing America's Compassion, Hearing Before The Subcommittee On Immigration And Border Security Of The Committee On The Judiciary House Of Representatives (Feb. 11, 2014), available at http://judiciary.house.gov/_cache/files/959caa6a-3ea2-44a0-aa79-b9da1cb175e9/113-66-86648.pdf.

This Court will be sending a message with defendant's sentence about the repercussions of fabricating asylum stories, and it imperative for the public and legal community to know that individuals will be prosecuted and punished when they intentionally abuse the system.

   **D.     A Guidelines Sentence is Necessary to Avoid Sentencing Disparities.**

The government's recommendation of 46 to 57 months' imprisonment comports with the sentences imposed in like cases in other districts where attorneys have been prosecuted and

sentenced for asylum fraud. For example:

- Two attorneys in Sacramento, Jagprit Singh Sekhon and Jagdip Singh Sekhon, were convicted of filing numerous fraudulent asylum applications containing fictitious stories of persecution, including false accounts of arbitrary arrest, detention, torture, and rape. Jagprit was sentenced to 108 months in prison and Jagdip was sentenced to 60 months in prison, with the sentencing judge noting that the flaws in the asylum system do not "give license to lawyers to take advantage of it" and that one of the primary purposes of the lengthy sentences was "to deter future criminal conduct by lawyers who take advantage of this flawed system." News Release, "3 Sacramento attorneys receive lengthy sentences in asylum fraud scheme investigated by ICE HSI," Immigration & Customs Enforcement (Sept. 24, 2010), www.ice.gov/pi/nr/1009/100924sacramento.htm.

- Two attorneys in New York, Yuchang Miao and Feng Ling Liu, were convicted of a conspiracy to commit asylum fraud on behalf of Chinese nationals between 2007 and 2012. Miao, who alleged that he only handled intake of applicants, was sentenced to 41 months' imprisonment. Liu, described as the ring leader and manager of the immigration-law practice, was sentenced to 60 months' imprisonment. *See United States v. Feng Li*, 630 F. App'x 29, 34 (2d Cir. 2015); Press Release, Lawyer Sentenced In Manhattan Federal Court To Five Years In Prison In Connection With Leadership Of Asylum Fraud Ring, available at https://www.justice.gov/usao-sdny/pr/lawyer-sentenced-manhattan-federal-court-five-years-prison-connection-leadership-asylum.

- Sheldon Walker, an immigration attorney in New York City who was convicted of preparing fraudulent asylum applications on behalf of clients and employing an interpreter who assisted clients in preparing for their asylum hearings, was sentenced by the district court for the Southern District of New York to 42 months' imprisonment, which was upheld on appeal. *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999).

In addition, close adherence to the Guidelines will reduce sentencing disparities across defendants and districts, which is itself a statutorily-mandated factor. 18 U.S.C. § 3553(a)(6); *see United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity").

## IV.   CONDITIONS OF SUPERVISED RELEASE

In *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the Seventh Circuit held that

sentencing courts must make an independent determination that each condition of supervised release imposed on a defendant is rationally and reasonably related to the offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D). Additionally, the Court must state the reasons for imposing each condition, and ensure each condition is not broader than necessary to achieve the purposes of sentencing. *Id.*

In light of the Court's ruling in *Thompson*, the government asks the Court to impose the following conditions of supervised release:

### Mandatory Conditions

The following conditions are mandatory under 18 U.S.C. § 3583(d):

1. Defendant shall not commit another federal, state, or local crime (Mandatory Condition #1).

2. Defendant shall not unlawfully possess a controlled substance. (Mandatory Condition #2).

3. Defendant shall submit to the collection of a DNA sample as directed by the probation officer. (Mandatory Condition #5).

4. Defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Discretionary Condition #8).

### Discretionary Conditions of Supervision

Under 18 U.S.C. § 3583(d), the Court has discretion to impose conditions of supervised release that are "reasonably related" to the factors set forth in 18 U.S.C. § 3553(a), that "involve[ ] no greater deprivation of liberty than is reasonably necessary," to meet the goals of § 3553(a), and that are "consistent with any pertinent policy statements issued by the Sentencing Commission."

The following conditions are consistent with the factors set forth in § 3553(a) and should be imposed on the basis that they facilitate supervision by the probation officer, which is important

20

here to promote defendant's respect for the law and deter the defendant from future crimes:

5.      Defendant shall not leave the judicial district without the permission of the Court or probation officer. *See* U.S.S.G. § 5B1.3(c)(1). (Discretionary Condition #14).

6.      Defendant shall report to the probation office as directed by the probation officer. *See* U.S.S.G. § 5B1.3(c)(2). (Discretionary Condition #15).

7.      Defendant shall permit the probation officer to visit the defendant at home, at work, or another reasonable location, at any reasonable time, and to confiscate any contraband in plain view of the officer.[4] *See* U.S.S.G. § 5B1.3(c)(10). (Discretionary Condition #16).

8.      Defendant shall notify the probation officer, within 72 hours, of any change of residence, employment, or workplace. *See* U.S.S.G. § 5B1.3(c)(6). (Discretionary Condition #17).

9.      Defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* U.S.S.G. § 5B1.3(c)(11). (Discretionary Condition #18).

10.      Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court. (Special Condition #11).

The crime in this case involves defendant's commission of fraud while employed as an immigration attorney. Accordingly, conditions intended to reduce the likelihood of re-offense are warranted:

11.      Defendant shall refrain from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, namely, any profession involving participation in the asylum, citizenship, or immigration process. (Discretionary Condition #5).

The following conditions of release support defendant's rehabilitation and reintegration into the community. *See* 18 U.S.C. § 3553(a)(2)(C) and (D). Additionally, conditions of release mandating that defendant work or perform community service also provide rehabilitation for

---

[4] An additional reason for this condition is that the defendant's knowledge that he is subject to the probation officer's scrutiny at any time will encourage compliance with the law.

defendant and ensure that he is engaged in lawful pursuits rather than criminal activity.

12.    Defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons. *See* U.S.S.G. § 5B1.3(c)(5).    (Discretionary Condition #4).

13.    Defendant shall refrain from knowingly meeting or communicating with any person whom you know to be engaged, or planning to be engaged, in criminal activity.   *See* U.S.S.G. § 5B1.3(d)(9). (Discretionary Condition #6).

14.    Defendant shall refrain from the excessive use of alcohol. (Discretionary Condition #7).

15.    Defendant shall work in community service for 100 hours as directed by a probation officer. (Discretionary Condition #12).

If the court imposes a financial penalty, including forfeiture of proceeds, the government

requests the following condition:

16.    Defendant shall pay any financial penalty that is imposed by this judgment that remains unpaid at the commencement of the term of supervised release. (Special Condition #10).

## V.    CONCLUSION

For the reasons stated above, the government respectfully requests that this Court

sentence defendant within the applicable Guidelines range of 46 to 57 months' imprisonment.

Respectfully submitted,
ZACHARY T. FARDON
United States Attorney

By:    s/ Andrianna D. Kastanek
ANDRIANNA D. KASTANEK
LINDSAY JENKINS
Assistant U.S. Attorneys
219 South Dearborn Street
Chicago, Illinois 60604