# In the
# United States Court of Appeals
# For the Seventh Circuit

No. 17-1644

UNITED STATES OF AMERICA,

                        *Plaintiff-Appellee*,

*v.*

ROBERT DEKELAITA,

                        *Defendant-Appellant*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 497 — **Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 19, 2017 — DECIDED NOVEMBER 17, 2017

Before WOOD, *Chief Judge*, and EASTERBROOK and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. Attorney Robert DeKelaita thought he had found the perfect recipe for success: identify a niche and become the expert. But he overlooked the part about complying with the law: his niche included helping clients submit fraudulent asylum applications. When it caught up with him, the government charged him with engaging in a single, dec-

ade-long conspiracy through which he facilitated the submission of nine fraudulent asylum applications. DeKelaita contends that it failed to prove such an overarching conspiracy, and that at best the evidence at trial showed only several independent conspiracies, none of which was properly subject to prosecution. Our review of the evidence convinces us otherwise. DeKelaita was charged with and convicted on only one conspiracy count. The jury had sufficient evidence to convict DeKelaita for either the charged conspiracy or a subsection of it. That is all the law requires, and so we affirm the judgment of the district court.

**I**

One of DeKelaita's specialties was providing legal representation for recent immigrants applying for asylum. Asylum in the United States is reserved for people who are unable to return to their home country because of either persecution or a well-founded fear of persecution based on "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Asylum is unavailable if the person can be sent to a safe country that is willing to accept him or her. § 1158(a)(2)(A). Applicants for asylum must submit a form that sets forth the basis for their application and how they meet the statutory criteria. They must then sit for an interview with a U.S. Citizenship and Immigration Services officer. *The Affirmative Asylum Process*, U.S. CITIZEN SERVICES (last visited Nov. 15, 2017), https://www.uscis.gov/humanitarian/refugees-asylum/asylum/affirmative-asylum-process. The applicant must provide a translator if one is needed. The interviewing officer eventually makes the initial determination of the applicant's eligibility. *Id.*

DeKelaita's clients were primarily Assyrian or Chaldean Christians from Muslim-ruled countries, such as Iraq. Many clients had indeed suffered persecution, but their eligibility was statutorily foreclosed or doubtful because they either had already found refuge in another county or their history of persecution failed to meet the required severity for asylum in the United States. Not willing to take "no" for an answer, DeKelaita tried to improve the chances of asylum for at least nine of his clients by submitting fraudulent applications. The nature of the fraud depended on the client. For some, DeKelaita concealed evidence that the applicant already had obtained legal status in a safe country. For others, he drafted and submitted applications that either fabricated or exaggerated the extent of persecution the applicant had endured.

At the interview stage, DeKelaita was able to ensure that applicants stuck to the script by bringing interpreters into the fold. He worked with the interpreter and client pre-interview to hammer out the narrative. When the interpreter accompanied the client to the interview, the interpreter spoon-fed answers to the applicant or "translated" incorrectly. Before 2006, the government did not have the benefit of interview monitors who might have flagged the discrepancies. Post-2006, there was a dearth of monitors who spoke Assyrian or Chaldean, the languages of DeKelaita's clients, leaving many interviews difficult, if not impossible, to review.

Between 2000 and 2003, DeKelaita followed this template for seven applicants. In all but one case, DeKelaita employed the same interpreter. A three-year gap followed before DeKelaita worked on the next allegedly fraudulent application. His *modus operandi* was unchanged, though he now used

the services of a different interpreter, Adam Benjamin. Another three years elapsed before DeKelaita submitted the last of the nine applications. This application, filed in November 2009 on behalf of Hilal Albqal, relied on an exaggerated history of persecution, which DeKelaita had concocted. DeKelaita again worked with Benjamin.

At trial he was convicted on four charges: one for conspiracy to defraud the government on the asylum applications, and three for false statements he either made or induced on Albqal's application. The district court vacated the three convictions related to Albqal's application following a post-trial motion. The jury unanimously found only one false statement in Albqal's application, but the court ruled that this statement was immaterial to his receipt of asylum. That meant, the court concluded, that the government had failed to prove an element of the substantive crimes. That left standing only the conspiracy conviction.

## II

On appeal from that remnant of the case, DeKelaita complains of a variance between the crime the government proved and the crime with which he was indicted. To prevail on his variance argument, DeKelaita must show both that no rational trier of fact could have found that the evidence at trial proved a single conspiracy and that the variance was prejudicial. *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009). This case presents a twist on the normal situation. Ordinarily, an argument of this sort arises in a "hub-and-spoke" conspiracy—in other words, an arrangement in which there is a brain center (the hub) masterminding either contemporaneous, similar-looking conspiracies or one large conspiracy with bit players (the spokes) orbiting the hub and coordinated

through it. The spokes rarely have anything to do with one another. Variance arguments are most often made by the spokes. Their complaint is typically that by charging what really was many conspiracies as one, the government put the defendant on trial for criminal conspiracies in which he played no part.

This case is different because DeKelaita is the hub. Usually there is no need to distinguish between a single conspiracy and multiple conspiracies in a case against the hub, because no matter the relationship between alleged conspiracies, the hub is involved in each. Consequently, there is no danger of wrongfully transferring guilt based on conduct from an unconnected conspiracy. *United States v. Flood*, 965 F.2d 505, 509 (7th Cir. 1992). DeKelaita nonetheless argues that he was prejudiced by the joinder of the allegedly distinct conspiracies because the government should not be able to "string together … conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." *United States v. Varelli*, 407 F.2d 735, 745 (7th Cir. 1969). He assumes that this statement from *Varelli* applies even to cases in which the defendant is that "one man."

DeKelaita also raises a second point about the significance in his case of the line between a single conspiracy and multiple conspiracies. He contends that none of the independent conspiracies (hub to spoke 1, hub to spoke 2, etc.) was subject to prosecution. With respect to the first eight asylum applications, he argues that prosecution is time-barred. See 18 U.S.C. § 3282(a) (providing a five-year statute of limitations). His conviction on the ninth, as we mentioned earlier, was vacated by the district court. Ergo, DeKalaita reasons, he cannot be prosecuted for the related conspiracy.

We assume for present purposes that each agreement to submit a fraudulent application was its own conspiracy, and that while the indictment charged one overarching conspiracy, the government proved nine individual conspiracies. We assume further that the existence of the individual conspiracies can be seen as a variance from the indictment. Even with those favorable assumptions, DeKelaita cannot prevail unless the alleged variance is prejudicial. And since he was convicted on only one count of conspiracy, he cannot show prejudice if there is sufficient evidence of a timely prosecution for a conspiracy related to any application. We therefore take up that question, starting with the most recent asylum application—Albqal's.

DeKelaita does not directly deny his involvement in a conspiracy to submit a fraudulent asylum application of behalf of Albqal. His forbearance is wise. The record shows that about one month after Albqal arrived in the United States, he met with DeKelaita. During that meeting Albqal told DeKelaita he wanted DeKelaita to be his attorney. They discussed Albqal's past, which included a house fire caused by an electrical short. DeKelaita advised Albqal that his application would be stronger if he said Islamic extremists started the fire. DeKelaita also told Albqal that he, DeKelaita, could add facts from Albqal's brother's application. The brother was also one of DeKelaita's clients. At the end of the meeting DeKelaita agreed to represent Albqal for his asylum application.

Instead of denying his involvement in Albqal's dishonest application, DeKelaita attacks from the flanks. He argues that his acquittal on all substantive charges related to Albqal's application forecloses a conspiracy conviction. But this reveals a fundamental misunderstanding of conspiracy law. Contrary

to DeKelaita's assertion, the post-trial judgment of acquittal on substantive claims does not preclude conviction for conspiracy. The law plainly states: "The crime of conspiracy is the agreement itself." *United States v. Corson*, 579 F.3d 804, 810 (7th Cir. 2009). Moreover, the judgment of acquittal in this case was granted because the only lie that the jury unanimously found to be included in Albqal's asylum application was immaterial to the grant of his application. Which lies were told on Albqal's application and whether they were material does not matter for purposes of conspiracy. Nor does it matter that the jury did not unanimously find DeKelaita had made or procured any of the other false statements to which the government pointed. Failing to achieve the conspiracy's goal does not negate the underlying agreement. *Id.*

With that cloud cleared, we can move to the main issue: was there an overt act in furtherance of the conspiracy within the five-year period preceding the indictment? See *United States v. Curley*, 55 F.3d 254, 257 (7th Cir. 1995) ("The statute of limitations runs from the last overt act in furtherance of that conspiracy."). The indictment was filed on September 4, 2014, making the relevant date September 4, 2009. Several overt acts occurred after that date, any of which renders the prosecution timely whether there was one or several conspiracies. Albqal's application was submitted on November 16, 2009. After that, Albqal met with DeKelaita on December 21, 2009, to prepare for Albqal's interview, which was to take place the following day. Benjamin, the interpreter, was at that meeting. DeKelaita told Albqal that Benjamin would interpret during the asylum interview and that Benjamin would let Albqal know what story Albqal was supposed to use during the interview. For his part, Benjamin gave Albqal instructions on what facts Albqal needed to memorize for the interview and told him

that he too would have the story memorized. Benjamin was with Albqal the next day at the asylum interview. Albqal admits that he lied during his asylum interview, and Benjamin translated the lies.

One final word. DeKelaita is unhappy with the government's dual *Santiago* proffers. A *Santiago* proffer is a pretrial filing made when the government intends to introduce statements from co-conspirators under Federal Rule of Evidence 801(d)(2)(E). *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991); *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). The purpose is to facilitate the admissibility of co-conspirator evidence by making a preliminary showing that "1) a conspiracy existed, 2) the defendant and the declarant were members thereof, and 3) the proffered statement(s) were made during the course of and in furtherance of the conspiracy." *Cox*, 923 F.2d at 526. In this case there were two *Santiago* proffers, the first of which alleged multiple conspiracies, while the second represented the evidence as supporting a single conspiracy. DeKelaita suggests that the government's initial take on its own evidence, revealed through the first *Santiago* proffer, is compelling support for finding that each application constituted a separate conspiracy. Because the distinction between one and many is immaterial in this case, whatever limited utility that argument may have has dissipated. Perhaps evidence that unfairly prejudiced the jury against DeKelaita was admitted under the auspices of a single conspiracy, but that is not the argument DeKelaita advances.

### III

DeKelaita was convicted on a single conspiracy count. Even if there was a variance between the indictment and evidence, there was sufficient evidence to establish the existence

No. 17-1644                                                                9

of a conspiracy to defraud the government. Therefore, any variance that existed did not prejudice DeKelaita. We AFFIRM the conviction.

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit